# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| GARI LEGHORN, | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:20-CV-217 (MTT) |
| | ) | |
| THE PRUDENTIAL INSURANCE | ) | |
| COMPANY OF AMERICA, | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

Defendant The Prudential Insurance Company of America ("Prudential") moves

for summary judgment on Plaintiff Gari Leghorn's claim under the Employment

Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), for disability

benefits allegedly owed under the Perdue Farms, Inc. Group Disability Policy.  For the

following reasons, that motion (Doc. 23), construed as a motion under Rule 52(a) of the

Federal Rules of Civil Procedure, is **GRANTED**.  Additionally, Leghorn's motion for

judgment under Rule 52(a) (Doc. 24) is **DENIED**.

## I. BACKGROUND

### A. Leghorn's injury

On February 26, 2018, Leghorn was involved in a car accident resulting in four

small fractures in her lower back and pelvis.  Docs. 27-1 ¶ 20; 20-7 at 30-35.  She saw

a primary care physician, Dr. Harvey Jones, on March 5, 2018.  Doc. 27-1 ¶ 21.  He

wrote a "care plan" involving an MRI of the spine and a CT scan of the pelvis, follow-up

with neurosurgery or orthopedic surgery, and referral to a pain clinic for chronic pain management. Doc. 20-7 at 35. On March 22, 2018, he wrote a note requesting that Leghorn be excused from work. *Id*. at 37. At some point, Dr. Jones diagnosed her with persistent lower back pain, herniated discs, and a pelvic contusion, and he opined that Leghorn "remains totally disabled unable to resume a form of gainful employment due to injuries to the lower back and pelvis causing extreme pain." *Id*. at 318.[1] An x-ray she brought to her June 6, 2018 appointment with Dr. Jones was negative for pelvic fractures, and a July 16, 2018 MRI revealed mild to moderate disc herniation. *Id*. at 349; *see* Doc. 27-1 ¶ 27.

In July 2018, Leghorn submitted a long-term disability claim to Prudential. Doc. 27-1 ¶ 28. In August, Prudential approved that claim. Doc. 20-7 at 164-171. Also in August, Leghorn consulted with an orthopedic physician, Dr. Pollydore, and a neurosurgeon, Dr. Rowe. Doc. 27-1 ¶¶ 30, 34.[2] Dr. Pollydore found she had a wide-based gait, normal reflexes, 5/5 neurologic motor strength, and disc displacement. Docs. 23-2 ¶ 32; 20-7 at 319-321.[3] Dr. Rowe found she had 5/5 strength in her lower

---

[1] The documents from that visit cited to in the record are not dated.

[2] In response to Prudential's statement of material facts, Leghorn makes several unhelpful denials. Here, Leghorn denies that she consulted with Dr. Rowe in August, for the sole reason that "this was a follow up visit; Dr. Rowe first saw patient at hospital right after the car accident." Doc. 27-1 ¶ 34. The Court does not see how a previous visit would negate the August visit, but agrees that the record shows Dr. Rowe first consulted with her in February.

[3] Leghorn denies that because the exam also revealed tenderness, abnormal lumbar motion, and mildly impaired coordination. "Further," Leghorn argues, "patient's Hoffman and Babinski reflexes were absent. Also, Ms. Leghorn's pain was 8 on a 10 scale. AR 20-7: 321." Doc. 27-1 ¶ 32. Of course, none of those facts are inconsistent with normal reflexes or motor strength. Whatever significance Leghorn's counsel attaches to the absent Hoffman and Babinski reflexes has not been argued to the Court or supported by evidence. For all the record reveals, negative Hoffman and Babinski reflexes may be more consistent with normal health than positive Hoffman and Babinski reflexes are. Further, every fact Prudential cites in that paragraph is supported by the medical records except one: Prudential claimed Dr. Pollydore found Leghorn had a normal gait (Doc. 23-2 ¶ 32), but he actually found Leghorn had a "wide based gait" (Doc. 20-7 at 321). That was the only error in Prudential's statement, but Leghorn did not specifically dispute it.

extremities, lumbar spondylosis, and disc protrusion.  Doc. 20-7 at 305-07.  Dr. Rowe

referred Leghorn to physical therapy.  Doc. 27-1 ¶ 36.

Leghorn started physical therapy on February 28, 2019 and continued through

July 10, 2019.  Doc. 27-1 ¶¶ 39-40.  On July 10, 2019, her physical therapist wrote that

Leghorn continued to see improvement in her pain with treatment, that she "has good

and bad days but overall she is feeling better," but that she still reported severe pain.

Doc. 20-7 at 658-59.[4]  The physical therapist also noted that Leghorn walked a mile

around the track each week and could sit for 15-30 minutes consecutively and stand for

15-30 minutes consecutively.  *Id*.

## B. Denial of benefits

On August 14, 2019, Prudential terminated Leghorn's long-term disability ("LTD")

claim.  *Id*. at 764.  That letter noted that Leghorn had received LTD benefits for one year

because she was unable to perform her "regular occupation"—a "Debone Wings

Laborer"—but that, under the policy, the standard for disability changed after twelve

months.  *Id*.  Rather than inability to perform one's regular occupation, after twelve

months Prudential evaluated disability based on whether one was unable to perform

"any gainful occupation."  *Id*. at 765-69; Doc. 24 at 4-5.  Prudential's letter stated that it

had "determined that the medical information received did not support impairment that

would prevent [Leghorn] from performing the material and substantial duties of any

---

Nonetheless, the Court relies on the record rather than Prudential's representation of that record, even where that representation is undisputed.

[4] Leghorn denies that she reported improvement, for the sole reason that she still had pain.  Doc. 27-1 ¶¶ 41-43.  But the physical therapist's notes clearly state that Leghorn reported improvement, and the fact she continued to experience some level of pain is not inconsistent with the fact that her pain improved.

gainful occupation." Doc. 20-7 at 765.[5] Prudential also notified her that it was missing medical records that were "needed in order to determine if you still meet the definition of disability as defined in your LTD policy." *Id*.

Leghorn, for her part, claims she sent those records. Doc. 27-1 ¶¶ 55-57. To support that claim, she first cites to a capacity questionnaire signed by Dr. Jones in July 2019. Doc. 20-7 at 624-25. The Defendants acknowledge that questionnaire but note, accurately, that it "was incomplete, as [Dr. Jones] did not give an estimated return to work date, did not outline any specific restrictions or limitations, and did not outline any work accommodations as requested." Doc. 23-2 ¶ 54. Second, Leghorn cites a letter from Prudential to Dr. Rowe requesting documents. Doc. 20-7 at 657. That letter contains the phrase "All Records Attached" scrawled in pen. *Id*. There is no evidence verifying (1) whether Leghorn sent that letter back to Prudential with documents attached or (2) if so, the date she sent it. The phrase "Aug. 1, 2019 12:01PM" is stamped in the upper-left corner of the letter. *Id*. Maybe that was stamped by a fax machine when it sent the documents. Then again, maybe not. Leghorn does not establish it either way.

On August 16, Leghorn sent Prudential an updated capacity questionnaire from Dr. Jones.[6] Doc. 20-7 at 787-89. In the questionnaire, Dr. Jones opined that Leghorn

---

[5] Leghorn disputes this on the basis that on August 12, 2019, Leghorn telephoned a "Claim Manager" at Prudential to tell that person that, in Leghorn's view, the only missing information was the capacity questionnaire, and the claim manager told her both (1) that the questionnaire was unnecessary and (2) that Jones could fill out the questionnaire instead of Rowe. Doc. 27-1 ¶ 58. Jones later sent Prudential the completed questionnaire—it is unclear when, but probably August 16. *Id*.

[6] Leghorn disputes this, claiming she sent it on August 14, 2019. Doc. 27-1 ¶¶ 61 (citing Doc. 20-7 at 788-89), 58. Once again, nothing to which Leghorn cited is actually evidence that she sent it on the 14th. There are two timestamps on the relevant document: one for August 14, 2019 and one for August 16, 2019. Her doctor signed and dated it as August 16, 2019, so it seems likely that Leghorn's counsel was mistaken. Doc. 20-7 at 788-89; *see id*. at 779.

could never climb stairs or ladders, stoop, kneel, crawl, or carry more than ten pounds, but could occasionally (1-33% of the time) stand, walk, sit, reach, lift or carry up to ten pounds, and use a mouse and keyboard. *Id*. Prudential submitted the records to a physical therapist, Perez, who reviewed notes from Jones, notes from Rowe, and notes from Leghorn's physical therapy and concluded Leghorn retained work capacity for several reasons: her fractures had healed, her lumbar range of motion was within normal limits, she tolerated exercise programs, and she had "4/5-5/5" motor strength "throughout all 4 extremities[.]" *Id*. at 844. Perez also opined that Leghorn could "frequently sit with changes in position, occasionally stand and walk, and lift 10 lbs frequently. She can occasionally bend, stoop, crouch." *Id*.

Prudential also obtained an employability assessment from Lindsay Neumann, a vocational specialist. *Id*. at 849-850. Based on Perez's conclusion, Neumann concluded Leghorn could "frequently sit with changes in position, occasionally stand and walk, and lift 10 lbs frequently. She can occasionally bend, stoop, crouch. Climbing ladders should be restricted." *Id*. at 849. Neumann also consulted the March 2019 Activities of Daily Living Questionnaire completed by Leghorn, and she appears to have consulted Leghorn's job description, an "Education and Employment History Form," and a July 19, 2019 note from Leghorn's file. Doc. 20-7 at 849, 461-470, 555-58, 562.[7] Prudential concluded that Leghorn had "the capacity to frequently sit with changes in position, occasionally stand, walk, bend, stoop and crouch and lift to 10 lbs. frequently."

---

[7] Neumann wrote "JD 7/31/2019," which the Court assumes is a job description. Doc. 20-7 at 849. She also wrote "VRETE 6/20/19," which appears to refer to an Education and Employment History form. *Id*. at 849, 5, 555-58. She also referenced "ILTPC 7/19/19," which appears to refer to a 7/19/2019 note that memorialized parts of Prudential's processing of Leghorn's claim and noted that "there has been difficulties contacting Clmt w/no IL TPC completed." *Id*. at 849, 5-6, 562.

Doc. 20-7 at 853.  Based on that, Prudential concluded that Leghorn could perform the job of a Food Checker and, therefore, that she was not disabled under the "any gainful occupation" standard.[8]  *Id*. at 853-54.

## C. Leghorn's appeals

Leghorn appealed through counsel on November 14, 2019, arguing she was disabled because of ongoing pelvic pain, herniated discs, and side effects of medication.  Docs. 23-2 ¶ 70; 27-1 ¶ 70.  To assess the appeal, Prudential sent Leghorn's claim for independent review to Dr. Patrick McKenna, a D.O. certified in occupational medicine.  Doc. 27-1 ¶ 71.  McKenna reviewed documents from Jones, Rowe, Pollydore, and the physical therapist, among other relevant correspondence, medical records, and documents from the claim process.  Doc. 20-7 at 956-58.  He concluded that Leghorn "should be restricted to the following: Sit frequently with positional changes as needed, stand and walk occasionally (up to 30 minutes at a time, up to three hours per day, combined standing and walking), Lift/carry up to 10 pounds frequently, push/pull up to 20 pounds frequently."  *Id*. at 958.  As to standing and sitting, McKenna concluded that he was "generally in agreement with [the] restrictions" noted in Jones's August 16, 2019 capacity questionnaire.  *Id*. at 959-960.

---

[8] Neumann analyzed the availability of that job in Leghorn's market.  She described Macon, GA as "a major metropolitan area with an MSA population of over 420,000."  Doc. 20-7 at 850.  It is unclear where the label "major metropolitan area" or the number 420,000 come from.  The record does not say.  As to the official sources, in 2010 the Census Bureau estimated the Macon, GA metropolitan statistical area ("MSA") had a population of 232,293.  It estimates that as of 2019, the Macon MSA had grown to 229,996.  That estimate rises to 415,405 when the Macon and Warner Robins MSAs are combined.  Perhaps Neumann meant to refer to the Macon-Warner Robins CSA rather than the Macon MSA.  U.S. CENSUS BUREAU, COMBINED STATISTICAL AREA POPULATION ESTIMATES AND ESTIMATED COMPONENTS OF CHANGE: APRIL 1, 2010 TO JULY 1, 2019, https://www2.census.gov/programs-surveys/popest/datasets/2010-2019/metro/totals/csa-est2019-alldata.csv.  In any event, the size of the market is a point on which Prudential may well have erred—but Leghorn never argued that.  As a result, perhaps, of Leghorn's decision not to press that point, neither the Government's census data nor other evidence on the size of the relevant labor market is in the record, so the Court does not consider that issue.

Neumann again reviewed the file, as supplemented by McKenna's assessment, and concluded Leghorn could work as a Food Checker. *Id*. at 1016. Again, Prudential denied disability benefits because Leghorn retained the capacity to work as a Food Checker. *Id*. at 1024-28.

On March 6, 2020, Leghorn appealed again, arguing (i) that the Social Security Administration ("SSA") had ruled Leghorn could not meet the requirements of any job in the national economy and (ii) that a Food Checker must sit for eight hours per day, but Leghorn's medical limitations restricted her to sitting for less than two hours at a time. *Id*. at 1042-43. Prudential again denied benefits, noting (i) that the SSA had different rules and guidelines from Prudential's disability plan and (ii) that "[w]hile the occupation of a Food Checker is performed seated, it is performed in environments such as cafeterias, dining establishments and food courts where Ms. Leghorn would be able to readily change her position from sitting to standing as needed throughout the workday." *Id*. at 1085-86. It notified her that the decision was final. *Id*. at 1086.

## II. DISCUSSION

### A. Motion for Judgment as a Matter of Law standard

When a decision is based on an agreed-upon administrative record, judicial economy favors using findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52 rather than summary judgment under Fed. R. Civ. P. 56. *Adams v. Hartford Life & Accident Ins. Co.*, 694 F. Supp. 2d 1342, 1345 n.1 (M.D. Ga. 2010) (citing *Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1363 n.5 (11th Cir. 2008)). Both parties move for judgment based on the administrative record of Leghorn's claim. Docs. 24; 25. Therefore, the Court treats these motions as a trial on the record pursuant to

Rule 52(a).  "In an action tried on the facts without a jury … the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."  Fed. R. Civ. P. 52(a)(1).

**B. ERISA analytical framework**

Because Leghorn is seeking benefits pursuant to an employee benefit plan, this matter is governed by The Employee Retirement Income Security Act of 1974 ("ERISA").  ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court."  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (citing 29 U.S.C. § 1132(a)(1)(B)).  ERISA itself does not provide a standard for courts reviewing benefits decisions made by plan administrators or fiduciaries. *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989)).  Based on guidance from the Supreme Court in *Glenn* and *Firestone*, the Eleventh Circuit "established a multi-step framework to guide courts in reviewing an ERISA plan administrator's benefits decisions."  *Id*.  The steps are:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355 (internal citation omitted).

## C. Burden of proof

A claimant suing under ERISA has the burden of proving entitlement to plan benefits. *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (internal citation omitted). However, "if the insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer generally must prove the exclusion prevents coverage." *Id*. (internal citation omitted). Here, Prudential only argues that Leghorn is not disabled under the "any gainful occupation" standard of the Plan. Leghorn has the burden of proof.

## D. Leghorn has not established that Prudential was wrong when it determined that Leghorn was not disabled from any gainful occupation

The first step of the *Blankenship* framework requires the Court to determine whether Prudential's denial of LTD benefits was "wrong"; that is, the Court must decide whether it agrees with the plan administrator's decision. *Blankenship*, 644 F.3d at 1355. In making this determination, the Court does not give any deference to Prudential's decision and, instead, "stand[s] in the shoes of the administrator and start[s] from scratch, examining all the evidence before the administrator as if the issue had not been decided previously." *Bates v. Metro. Life Ins. Co.*, 2009 WL 2355834, at *10 (M.D. Ga. July 27, 2009) (internal quotations and citation omitted). The Court must limit its review

of the evidence to the same record that was before the plan administrator at the time

benefits were denied. *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1247

(11th Cir. 2008) (citing *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137,

1139 (11th Cir. 1989)).

Leghorn first argues Prudential was wrong to terminate her benefits in August

2019 for insufficient medical records. Doc. 26 at 5-8. As noted, Prudential terminated

benefits on August 14, 2019 for the stated reason that Leghorn had not submitted

certain documents and the documents she had submitted failed to support her claim for

disability. At the earliest, Leghorn submitted Jones's capacity questionnaire on August

14, 2019—the date Prudential had told her it would render a decision—and the record

reveals that, as of August 14, Prudential had not received a fully completed capacity

questionnaire. *See* n.7, *supra*. Accordingly, its decision was not wrong at the time.

Further, after Prudential received the updated questionnaire, it gave it full consideration.

So even if Prudential's denial for failure to provide documents was wrong, which it was

not, that denial was not final.

Second, Leghorn claims both Dr. Jones and Dr. McKenna found she was limited

to *occasional* sitting and that, as a result, Leghorn does not meet the physical

requirements of a Food Checker. Doc. 26 at 8-14. Dr. Jones clearly concluded

Leghorn could only sit occasionally, meaning 1% to 33% of a typical workday. Doc. 20-

7 at 787-89. However, "occasionally" does not appear in McKenna's conclusion. In

fact, McKenna stated that he was "generally in agreement with [Jones's] restrictions *as

stated in my response to question number one* above." *Id*. at 999 (emphasis added). In

his response to question one, he concluded that "[i]n order to prevent worsening of the

condition in [Leghorn's] lumbar spine, she should be restricted to the following: Sit frequently with positional changes as needed . . ." *Id*. at 997. McKenna clearly found Leghorn could sit frequently, a fact which Leghorn's brief consistently ignores.[9]

Leghorn argues that her treating physician opined she could sit only occasionally. But "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Prudential was entitled to rely on its consulting physician's report, and Leghorn has not demonstrated that McKenna's or Perez's reports are unreliable or that Jones's is more reliable. McKenna's, Perez's, and Neumann's reports support Prudential's determination that Leghorn was not disabled. Nothing in Leghorn's evidence or her characterization of the evidence materially undermines that determination. Accordingly, the Court finds that Leghorn has not established that Prudential was wrong.

## E. Even if Prudential's decision was de novo wrong, it was not unreasonable

Because the decision was not de novo wrong, the Court should end judicial inquiry and affirm the decision. *Blankenship*, 644 F.3d at 1355. However, even if it was de novo wrong, Prudential's decision was reasonable. Leghorn does not dispute that Prudential was vested with discretion in reviewing claims. Doc. 26 at 14. Rather, she

---

[9] Leghorn's assertion that McKenna found she was limited to occasional sitting misunderstands the record. And that misunderstanding underpins Leghorn's primary arguments for why Prudential was de novo wrong ("[h]ere you have the treating physician and the reviewing physician in agreement. They both state that Plaintiff is limited to occasionally sitting") and why Prudential's decision was unreasonable ("[d]espite two physician opinions, Defendant ignored their conclusions and decided the Plaintiff could sit frequently"). Doc. 24 at 23, 29.

argues that Prudential was arbitrary and capricious because it ignored evidence. The Court disagrees.

First, Leghorn repeats her mistaken assertion that Jones and McKenna both concluded Leghorn could sit only occasionally. *Id*. at 15. Again, McKenna did not reach that conclusion, but instead concluded Leghorn could sit frequently. Doc. 20-7 at 997. Second, Leghorn claims that it was an abuse of discretion for Neumann to ignore the opinions of Jones and McKenna. Doc. 26 at 15. Again, McKenna concluded Leghorn could sit frequently. And Prudential did not ignore Jones's opinion: Perez accounted for Jones's conclusions in her report (Doc. 20-7 at 843), McKenna reviewed his visit notes and capacity questionnaire (Doc. 207- at 953-961), and Prudential acknowledged Jones's conclusions in its letter resolving Leghorn's first appeal (Doc. 20-7 at 1025) and in its note analyzing Leghorn's second appeal (Doc. 20-7 at 1073).

Second, Leghorn argues that Prudential "slighted evidence that the Social Security Administration used to rule Plaintiff was totally disabled." Doc. 26 at 16. What "evidence," Leghorn does not say. Apparently she intends to argue that a "person disabled under the SSA['s] definition would [necessarily] meet the Defendant's definition [of disability]." *Id*. at 18. As Prudential has repeatedly argued, the SSA found that there were no jobs in "significant numbers in the national economy that the claimant can perform." Doc. 20-7 at 1046. The SSA does not consider whether work exists in the immediate area. 20 CFR § 404.1566(a). Prudential's plan's definition of long-term disability, which requires the claimant to show that she is disabled from "any gainful occupation," does not account for whether alternative jobs exist in the national economy. Doc. 20-6 at 15. Leghorn has not responded to that argument. Similarly, the

SSA decision accounted for age and expressly noted that "[t]he claimant was an individual closely approaching advanced age on the established disability onset date (20 CFR 404.1563 and 416.963)."[10]  Doc. 20-7 at 1045.  Age does not appear to be a factor in Prudential's definition.  Further, Prudential gave careful consideration to the SSA's decision and what impact, if any, it should have on Leghorn's claim.  *Id*. at 1066-68.

Although it is possible that the SSA decision would be relevant to Leghorn's claim, she has not offered any support for her contention that "[a] person disabled under the SSA definition would meet the Defendant's definition."  Doc. 26 at 18.  And Prudential clearly did not ignore the SSA's decision in considering Leghorn's appeal.

Third, Leghorn argues she "made it clear that her appeal for benefits after the first year was based on pain from spinal herniated disks" and claims Prudential ignored the issue of herniated discs.  *Id*.  That argument is contradicted by the record: after Leghorn's appeal, Prudential referred the claim for review.  Doc. 20-7 at 944-45.  The referral noted that "Attorney advised that her pelvic fractures have healed but she still has a severe pelvic contusion. Her disc herniation causes severe pain all the time resulting in limited ROM supported by and / or consistent with the documentation we have provided for your review (e.g. physical exams, diagnostic testing, reported and / or observed activities).  Please provide a detailed explanation and point to the specific documentation in support of your opinion."  *Id*. at 945.  McKenna, who completed the review, began his report by noting that "[t]he claimant is a 53 year old female with

---

[10] The cited regulations note that "[i]f you are closely approaching advanced age (age 50–54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work."

bilateral superior pubic rami fractures, L2-L5 vertebral transverse process fractures, and *L3-L4, L4-L5 disc herniation* diagnosed following a motor vehicle collision on 02/16/2018." *Id*. at 953 (emphasis added). McKenna reviewed MRI imaging of the herniation (*id*. at 955) and factored it into his work restrictions (*id*. at 958). Prudential did not ignore Leghorn's herniated discs.

Leghorn makes several other underdeveloped arguments. First, she claims that "a disability income plan can be found to have acted arbitrarily and capriciously when the denial of benefits is based on vocational capacity as determined by its own consultant with flawed information." Doc. 26 at 18. But she never explains what "flawed information" Prudential's consultants allegedly based their opinions on. Second, she points to *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133 (2d Cir. 2010), which, she claims, "ruled it was arbitrary and capricious for the defendant to expect the plaintiff at her age to develop the skills to work in a semi-skilled job like food checker." Doc. 26 at 19 (citing *Durakovic*, 609 F.3d at 142). But the claimant in that case was 60 (Leghorn was 53), had an elementary education (Leghorn had a high-school education), with little English. Finally, the *Durakovic* claimant had an independent vocational expert who supported her claim; Leghorn did not.

Leghorn also argues that Prudential violated her right to full and fair review, citing *Brown v. J.B. Hunt Transp. Services Inc.*, 586 F.3d 1079, 1087 (8th Cir. 2009). Doc. 26 at 20-21. That decision reversed a district court's dismissal for failure to exhaust administrative remedies, holding that a claimant need not exhaust if the claim administrator failed to provide full and fair review. Of course, exhaustion is not at issue here. Further, Leghorn argues she was denied access to Perez's report, but she cites

no evidence—such as an affidavit—supporting that assertion.  Nor is it clear that she or her lawyer ever asked for those materials.[11]

For those reasons, Leghorn has failed to show Prudential's decision was arbitrary and capricious, and the Court finds that there were reasonable grounds for the decision.

Finally, Leghorn argues that Prudential was biased.  Doc. 26 at 21-22.  First, Leghorn argues that Prudential profited by denying benefits, which creates a conflict of interest.  *Id*.  It is true that a "conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds."  *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011).  Accordingly, the Court considers that as a factor in reviewing Prudential's decision.  Still, even when there is a structural conflict, "[t]he burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest."  *Id*. at 1357.[12]  As noted above, the decision was reasonable, which is some evidence that the decision was not tainted by structural conflict.  Further, after deciding that Leghorn had not submitted sufficient documentation to substantiate her claim, Prudential considered late-submitted documentation on appeal.  Again, that provides some indication that the conflict did not taint Prudential's process.

---

[11] Further, as Prudential notes, it advised Leghorn that she was "entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim."  Doc. 20-7 at 1027; *see* Doc. 25 at 16-17.

[12] Judicial review of ERISA claim-resolution process is not employee-friendly, a reality particularly apparent when insurers act as plan administrators.  *Blankenship* is binding precedent, but it perhaps provides context to read the district court's reaction to *Blankenship.  See Blankenship v. Metro. Life Ins. Co.*, 806 F. Supp. 2d 1180 (N.D. Ala. 2011).

## III. CONCLUSION

For that reason, Prudential's motion for judgment as a matter of law (Doc. 23), construed as a Rule 52(a) motion, is **GRANTED**, and Leghorn's motion (Doc. 24) is **DENIED**.

In its reply brief, Prudential stated that "[t]he Court should enter judgement in favor of Prudential with regard to its counterclaim."  Doc. 28 at 10.  The Court disagrees: Prudential never moved for judgment, or requested entry of default[13], on its counterclaims.  *See* Doc. 23 at 1 ("Prudential respectfully requests that this Honorable Court enter summary judgment in its favor *as to Plaintiff's claim for benefits*.").  Those claims remain.

**SO ORDERED**, this 23rd day of June, 2021.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[13] The Court is not suggesting that default would be entered if requested.